UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA     :
                             :
v.                           :   CR. No.   CR 23-08MSM
                             :
M & D TRANSPORTATION, INC.,  :
and DIESEL TUNE-UPS OF RI, INC. :

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States and Defendants, M & D TRANSPORTATION, INC. and DIESEL TUNE-UPS OF RI, INC., have reached the following agreement:

1. <u>Defendants' Obligations</u>

   a. Defendants will waive presentation of this matter to a grand jury and consent to the filing of an Information which charges conspiracies in violation of 18 U.S.C. § 371 and violations of the Clean Air Act, 42 U.S.C. § 7413(c)(2)(C). Defendants expressly and unequivocally admit that they committed the crimes charged in Counts 1-6 of the Information, did so knowingly and willfully, and are in fact guilty of those offenses. Defendants will plead guilty to the Information. Defendants further agree that the time between the filing of this plea agreement and the scheduled date for the change of plea is excludable under the Speedy Trial Act, 18 U.S.C. §3161.

   b. Defendants agree to waive venue, to waive any applicable statute of limitations, and to waive any legal or procedural defects in the Information. Defendants agree to the accuracy of the facts set forth in the Information.

2.  Government's Obligations

In exchange for Defendants' pleas of guilty:

   a.  At sentencing, the government agrees to recommend the joint sentencing recommendation outlined in ¶ 5.

   b.  For purposes of determining the offense level, the government agrees to recommend a two-level reduction in the offense level for acceptance of responsibility under § 3E1.1(a) of the United States Sentencing Guidelines ("guidelines") if Defendants continue to demonstrate acceptance of responsibility through sentencing.

   c.  Defendants have timely notified authorities of an intention to enter a plea of guilty. Therefore, if the offense level determined by the Court under the sentencing guideline is a level 16 or greater, the government will move the sentencing Court for an additional decrease of one level pursuant to U.S.S.G. § 3E1.1(b).

   d.  The government is free to recommend any combination of probation conditions which it deems appropriate.

3.  The guidelines provide guidance for the sentencing of corporate Defendants, except that, pursuant to section 8C2.1 and 8C2.10, the guidelines that pertain to the sentencing of organizations do not determine the fine range in cases involving environmental crimes. The parties agree that all other sections of chapter 8 of the guidelines are applicable to this case, including the provisions for probation and community service. Defendants understand that the guidelines are not binding on the Court, and that, although the Court must consult the guidelines in fashioning any sentence in this case, the guidelines are only advisory, and the Court may impose any reasonable sentence in this matter up to the statutory maximum penalties after taking into account the factors enumerated in 18 U.S.C. §§ 3553(a) and 3572.

4. <u>Statutory Maximum Sentence</u>

Defendants face the following maximum penalties as to each of Counts One through Six of the Information (Conspiracy and Clean Air Act violations): a term of five years of probation, a maximum fine of $500,000 or twice the amount of the gross gain or twice the amount of the gross loss resulting from the offense, and a $400 mandatory victim's fund assessment fee. 18 U.S.C. § 3571(c).

5. <u>Joint Sentencing Recommendation</u>.  The United States and Defendants jointly agree to make the following sentencing recommendation to the Court:

a. A term of probation of 3 years, with the following special condition of probation:

i. By no later than thirty (30) days after sentencing, Defendants will engage a qualified, third-party independent consultant to conduct an audit of all vehicles owned or operated by M & D to determine that no aftermarket emissions alterations have been made to the vehicles and that there has been no emissions-related tampering to the OBD system of each vehicle. Within no later than sixty (60) days after sentencing, M & D will submit a certification to Probation and to the United States Attorney's Office that all of its vehicles are in compliance with the emissions-related requirements of the Clean Air Act.

b. The parties will be free to recommend whatever fine and other conditions of probation they feel are appropriate.

6. Except as expressly provided in the preceding paragraphs, there is no agreement as to which Offense Level and Criminal History Category applies in this case. The parties agree, however, that because the offense charged in the Information is an environmental offense that is covered by Chapter Two, Part Q of the Sentencing Guidelines, the fine guidelines of U.S.S.G. §§

8C2.2 through 8C2.9 do not apply. U.S.S.G § 8C2.1. Both the United States and Defendants reserve their rights to argue and present evidence on all matters affecting the application of the guidelines.

7.  Defendants agree that, after Defendants and Defendants' counsel sign this agreement, counsel will return it to the United States Attorney's Office along with a money order or certified check, payable to the Clerk, United States District Court, in payment of the special assessments. Failure to do so, unless the Court has made a previous finding of indigence, will relieve the government of its obligation to recommend a reduction in the offense level under the guidelines for acceptance of responsibility.

8.  Defendants are advised and understand that:

   a. The government has the right, in a prosecution for perjury or making a false statement, to use against Defendants any statement that Defendants gives under oath;

   b. Defendants have the right to plead not guilty, or having already so pleaded, to persist in that plea;

   c. Defendants have the right to a jury trial;

   d. Defendants have the right to be represented by counsel – and if necessary, have the Court appoint counsel – at trial and every other stage of the proceeding;

   e. Defendants have the right at trial to confront and cross-examine adverse witnesses, to be protected from self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

   f. Defendants waive these trial rights if the Court accepts a plea of guilty.

9.  The government reserves its full right of allocution, including the right to present any information to the Court for its consideration in fashioning an appropriate sentence, the right

to correct misstatements, misrepresentations, or omissions by Defendants, and to answer any questions asked by the Court.

10. Except for paragraphs 2, 3 and 6 above, the parties have made no agreement concerning the application of the guidelines in this case.

11. Defendants understand that the Court alone makes all sentencing decisions, including the application of the guidelines and the sentence to be imposed. Pursuant to section 6B1.4 of the Sentencing Guidelines, the Defendants and the Government have entered into the attached stipulation, which is a part of this plea agreement. The Defendants understand that this stipulation does not set forth all the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The Court is not bound by the parties' stipulations of fact, offense level adjustments, or the government's recommendations. The Court is free to impose any sentence it deems appropriate up to and including the statutory maximum. Defendants also understand that even if the Court's guideline determinations and sentence are different than Defendants expect, Defendants will not be allowed to withdraw Defendants' plea of guilty.

12. Defendants hereby waive Defendants' right to appeal the conviction and sentence imposed by the Court, if the sentence imposed by the Court is within or below the sentencing guideline range determined by the Court. This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b), and the government retains its right to appeal any of the Court's sentencing determinations.

13. This agreement is binding on the government only if Defendants plead guilty, fulfill all Defendants' obligations under the agreement, do not engage in any conduct constituting obstruction of justice under § 3C1.1 of the guidelines, and do not commit any new offenses. Defendants understand that if Defendants violate this agreement in any way, the government shall be released from its obligations under the agreement and will be free to make any recommendations that it deems appropriate. If that occurs, Defendants shall not have the right to withdraw Defendants' guilty pleas.

14. This agreement is limited to the District of Rhode Island and does not bind any other federal, state, or local authorities. The Defendants acknowledge that no representations have been made to it with respect to any civil, administrative, or collateral consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the Defendants acknowledge that this agreement has been reached without regard to any civil tax matters that may be pending, or which may arise involving it.

15. The Defendants understand that it will be adjudicated guilty of the offenses to which they have pleaded guilty and may be deprived of certain rights. The Defendants understand that the Government reserves the right to notify any state or federal agency by which it is licensed, or with which it does business, of the facts of its conviction.

16. This agreement constitutes the entire agreement between the parties. No other promises or inducements have been made concerning the plea in this case. Defendants acknowledge that no person has, directly or indirectly, threatened or coerced Defendants to enter this agreement. Any additions, deletions, or modifications to this agreement must be made in writing and signed by all the parties in order to be effective.

17. Counsel for Defendants states that Counsel has read this agreement, been given a copy of it for Counsel=s file, explained it to Defendants, and states that to the best of Counsel=s knowledge and belief, Defendants understand the agreement.

18. Defendants states that Defendants have read the agreement or have had it read to Defendants, have discussed it with Defendants=s Counsel, understand it, and agree to its provisions.

M & D TRANSPORATION, INC.
Defendant
BY:

_____
(Print name & corporate office held)

Date 1-18-2023

DIESEL TUNE-UPS, INC.
Defendant
BY:

_____
(Print name & corporate office held)

Date 1-18-2023

_____
CHRISTOPHER MILLEA, ESQ.
Counsel for Defendants

1/18/2023
Date

_____
JOHN P. MCADAMS
Assistant U.S. Attorney

1/20/2023
Date

_____
LEE H. VILKER
Assistant U.S. Attorney
Chief, Criminal Division

1/25/23
Date

## ATTACHMENT A
### Stipulation of Offense Conduct

The Defendants and the Government stipulate to the following offense conduct that gives rise to the Defendants' agreement to plead guilty to the Information.

M & D Transportation, Inc. (M & D) is a transportation company located in North Kingstown, Rhode Island. M & D operates a fleet of heavy duty, diesel tractor/trailer vehicles and offers local, mid-range, and long-haul transportation services. On or about August 27, 2014, an M & D employee established Diesel Tune-Ups of RI, Inc. ("Diesel Tune-Ups"), a Rhode Island corporation. On or about September 2, 2014, an M& D employee established a bank account for a Diesel Tune-Ups"). M & D and Diesel Tune-Ups shared the same address in Kingstown, Rhode Island.

From in or around September of 2014 through in or around August 27, 2019, M & D and Diesel Tune-Ups made money by conspiring with each other; and with a foreign national ("S.V."); and with various trucking and diesel vehicle sales and repair companies throughout the United States and others, to download software or "tune" the Electronic Control Modules (ECM) and On Board Diagnostic ("OBD") monitoring systems on heavy-duty diesel vehicles (such as semi-trucks or "big rigs").

M & D also deleted or rendered inoperable emission control equipment on some of M & D's own diesel vehicles and then worked with S.V. to "tune" or tamper with ECM/OBD monitoring system on the vehicles.

The tuning business was marketed on Facebook, citing increased power and better fuel mileage. An entity associated with S.V. created a Facebook page on or about September 29, 2016, advertising ECM tuning and reprogramming for "BigRig semi trucks & engines" including tuning related to emission control equipment such as the Diesel Particulate Filter (DPF); Exhaust Gas Recirculation System (EGR); and the Selective Catalytic Reduction System (SCR). The Facebook page directed interested companies to contact a Rhode Island telephone number associated with M & D and Diesel Tune-Ups.

M & D, Diesel Tune-Ups, S.V., and others agreed with each other and with numerous heavy duty trucking and diesel vehicle sales and service companies throughout the United States (the "Companies") that, in exchange for a fee, S.V. would download and cause to be downloaded tuning software for the Companies' or the Companies' customers' ("Customers") vehicles either through a laptop computer shipped to the Companies by M & D or Diesel Tune-Ups for connection to each vehicle's OBD port, or by other means such as having the vehicle's ECM removed, shipped for tuning, and sent back.

When tuning was done through a laptop computer, M & D, Diesel Tune-Ups, and others instructed the Companies to call S.V. at a particular telephone number for further instructions once they had received the laptop computer. Through a remote connection, the "tunes" then were downloaded onto each vehicle's ECM or computer to reprogram the vehicle's settings and OBD system. Under normal operating conditions, an OBD system will detect any removal and/or malfunction of a vehicle's emissions control equipment. The tunes tampered with the ECM and

the OBD system's monitoring function so that it would not detect malfunctions in the DPF, EGR, or other emission control components that had been removed or disabled on the vehicle, thereby allowing vehicles to operate without proper emission controls.

The Companies paid Diesel Tune-Ups between $1,700 and $3,650 for each vehicle tuned. As described below, Diesel Tune-Ups wired a portion of the funds to S.V., and deposited funds into accounts belonging to Diesel Tune-Ups, M & D, and others. The Companies charged their Customers both for the work the Companies had performed to remove or disable the pollution control equipment on the Customer's vehicles (such as hollowing out or removing the emission control equipment), along with an amount for the tuning (thereby passing along what the Company had paid to Diesel Tune-Ups, plus an additional amount for the Company).

From at least March of 2017 through at least June 1, 2018, there were deposits into the Diesel Tune-Ups bank account from approximately 25 different diesel trucking or repair shops throughout the United States. Most were for amounts between approximately $2800 and $3600. For example:

- Between on or about November 16, 2016, and on or about September 4, 2018, Diesel Tune-Ups sent at least twenty-three invoices to Company A in Louisiana, a diesel service company, most for either $2,850 or $3650 and totaling approximately $74,050. A Diesel Tune-Ups invoice for $3,650 dated January 12, 2018, states "ISC/ISB/ISM/ISL + UREA/DEF removal." Payments for that work were sent to Diesel Tune-Ups.

- Between on or about November 14, 2017, and on or about January 22, 2018, Diesel Tune-Ups sent at least seven invoices to Company B in Indiana, most for between $2550 and $3250, and totaling approximately $19,350. The invoices describe the work as related to the "dpf" and "egr" or "DPF + EFR removal + fuel economy upgrade." Payments for that work were sent to Diesel Tune-Ups.

- Between on or about June 14, 2017, and on or about May 7, 2018, Diesel Tune-Ups sent at least twenty-nine invoices to trucking Company C in Minnesota, most for between $2800 and $3650, and totaling approximately $85,600. Most invoices reference "dpf" and/or "egr." Invoices dated November 15, 2017, and December 5, 2017, stated "EGR/DPF/UREA Delete." Payments for that work were sent to Diesel Tune-Ups.

- Between April 3, 2017, and September 26, 2017, Diesel Tune-Ups sent at least four invoices to trucking Company D in Kansas, three for $2,850 and one for $1750, totaling approximately $10,300. The invoices reference "dpf" and/or "egr," or "egr delete." Payments for that work were sent to Diesel Tune-Ups.

Funds deposited into the Diesel Tune-Ups account were later transferred to the accounts of M & D, S.V. or others. For example, between on or about March 9, 2017, and on or about August 27, 2019, Diesel Tune-Ups made approximately 100 withdrawals from the Diesel Tune-Ups account in amounts totaling $818,621.33 — $771,704.38 was deposited into M & D's account, and $47,171.64 was deposited into the personal accounts of two individuals associated with both DIESEL TUNE-UPS and M & D. In addition, between on or about September 5, 2014, and on or

about November 9, 2017, at least $637, 572.73 was wired from the Diesel Tune-Ups account to a foreign bank account owned by V.S.

Diesel exhaust is known to contain a variety of air pollutants, such as particulate matter (PM), nitrogen oxides (NOx), carbon monoxide (CO) and non-methane hydrocarbons (NMHC), as well as substances identified as hazardous air pollutants under the Clean Air Act: Ethylbenzene, Formaldehyde, n-Hexane, Lead Components, Manganese Compounds, and Mercury Compounds. The act of completely removing or disabling a vehicle's emission control system can increase PM by a factor of approximately 40 times, NOx by a factor or approximately 310 times, CO by a factor of approximately 120 times, and NMHC by a factor of approximately 1,100 times, presenting a risk to the environment and public health. More recent testing conducted by EPA indicates that the pollutant increase is even greater when the emission controls are deleted from commercial semi-tractor trailer trucks.